# APPENDIX 5 - RIGHTS-OF-WAY

A right-of-way (ROW), as used within the context of this Appendix, is a permit issued by the National Park Service to a third party to pass over, under or through NPS property. A ROW permit is a discretionary and revocable document and, unlike a deeded easement or fee simple ownership, does not convey or imply any interest in the land. In addition, a ROW permit may only be issued under certain, stringent circumstances. The NPS is under congressional mandate not to allow any use of NPS land that would impair or be a derogation of the values and purposes for which the park was authorized or be incompatible with the public interest, except when authorized by Congress.

## Authority

**There must be specific authority in the law allowing the type of use for which a ROW is requested.** Authority for a utility ROW through parks is found in 16 U.S.C. 5 for telecommunications; and 16 U.S.C. 79 for electric power, telephone and telegraph, and a wide variety of water conduits, dams and reservoirs (including sewer); or park-specific legislation.

Authority for highways that are part of the Federal Aid Highway System is found at 23 U.S.C. 107(D), 138 and 317. Authority for permitting access to inholdings in Alaska park units is located at 16 U.S.C. 3170(b) (ANILCA) 1110(b). (See Director's Order and Reference Manual 87 for policy and procedures for non-NPS roads in parks.)

Authority for roads and utilities *constructed for and owned and operated by the parks and/or its concessions*, is found at 16 U.S.C. 1-3 and 8. This authority uses the same tests for derogation of values and purposes, and compatibility with the public interests.

Examples of uses for which there are **no general authorities** are **roads that are not a part of the Federal-Aid Highway Project System** (National Highway System), and **oil, gas or other petroleum product pipelines.** Oil and gas lines that serve NPS facilities only may be authorized under 16 U.S.C. 1-3, but these lines may not be extended to serve any other purpose. **If authority for the requested use is not found in the general legislation or other sources, the park must deny the use.** (See 30 U.S.C. 185(b))

Should an unauthorized use already exist, and the park discovers that it does not impair or is not in derogation of park resources, values or purposes, it is not incompatible with public interests, and there are no practicable alternatives to being on NPS land, the park should contact the appropriate regional program manager for assistance.

Except as specifically provided by law or policy, there will be no permanent road, structure or installation within any study, proposed, or designated wilderness area. This includes the installation of utilities. (See the Wilderness Act 16 U.S.C. 23). The NPS will not issue any new right-of-way permits or widen or lengthen any existing rights-of-way in designated or proposed wilderness areas.

## Policy

A ROW permit is the required instrument for use in documenting and permitting utilities and other uses of NPS land within the National Park System. This includes those utilities not owned by the NPS but serving NPS and/or concession facilities. NPS owned utilities do not require a ROW permit. A ROW permit is not required for those instances when the specific use is authorized by property rights, such as a deeded easement, or by park-specific or other legislation when the legislative language is so written as to have the same effect as a deeded easement.

All parks will use 16 U.S.C. 79 as the authority to permit utility ROW for all electric, telephone and telegraph lines, and for canals, ditches and other water conduits, including sewer lines. 16 U.S.C. §5 will be used for telecommunication and other forms of communication transmitting and receiving structures and facilities. This would include cable television lines.

**As a general rule, and where and when possible, all new utility lines in parks will be placed underground and in conduit.** While economic factors must be considered, undergrounding utility lines should be done by directional boring rather than trenching. For especially long lines or other factors that would make directional boring impractical, the superintendent may allow trenching to occur in preference to the installation of overhead lines. All parks with existing overhead utility lines should attempt to have those lines placed underground as the opportunity occurs. These lines should also be directionally bored and placed in conduit where and when possible.

## Regulations

NPS general regulations regarding ROW permits are located at 36 CFR Part 14. The regulations for NEPA 102 and NHPA 106 compliance are located at 40 CFR Part 1500 and 36 CFR Part 61. Alaska-specific regulations on ROW's and NEPA compliance cost recovery are located at 43 CFR Part 36 and Subpart 2808.

## The Right-of-Way Permit

The format for a ROW permit has been standardized and approved, and should be used by all parks originating these documents. Examples of a fee and non-fee ROW permit using the approved templates are attached here as Exhibits 4 and 5.

The standardized permits have been approved by the Solicitor's Office and when used, do not require further review by their office. Changes to the standardized permit WILL require at least consultation with your solicitor if not their actual review and approval. Copies of the approved fee and non-fee ROW templates may be obtained from your regional special park use coordinator.

If the ROW permit being submitted for review and approval required NEPA and/or Cultural resource compliance, the park will include copies of the compliance documents (Environmental

Review and Compliance Form, Environmental Assessment, Environmental Impact Statement, Finding of No Significant Impact, and Assessment of Actions Having an Effect on Cultural Resources, as applicable) with the package. (See Chapter 6.) In all instances, the originals of the compliance documentation should remain in the park.

All *new* ROWs must be submitted to the Regional Director for review, approval and signature. If the permit is a amendment, conversion or renewal of an existing permit, which has been reviewed at the Regional level, it will be signed by the Superintendent.

Undocumented utility lines exist in the parks. A line that has been undiscovered for some time would, to a certain extent, be treated as a new permit. If the park decides to allow the line to remain, a ROW permit will be prepared and submitted to the Regional Director for review, approval and signature.

## Conversions

Special Use Permits or other documents will not be used to authorize utilities within NPS areas, including those which serve the park. All existing special use or other types of permits issued for this purpose will be converted to ROW permits as they expire or sooner at the convenience of the park..

## Right-of-Way Amendments and Renewals

Amendments are normally used to document small or minor changes to the use described, or the stated conditions that regulate that use. Examples of such changes would be: If the company wanted to add an additional line within an existing and already permitted trench, or request periodic permission to tap into the line for testing purposes. If a major change is contemplated, an amendment may not be appropriate and the park should consider writing a new document. An example of a major change would be if a company wanted to change the route of existing lines to an area not already under permit and different from the existing route, or possibly perform a major upgrade in the nature of the lines.

A ROW permit may be amended at any time for several reasons. Amendments may require NEPA and other compliance. The Amendment is used to renew a ROW. Amendments are executed by the Superintendent. See Exhibit 7 for an example of a completed Amendment.

## Rights-of-Way for Roads

A 1991 decision by the Washington Solicitor has determined that the proper document to use when NPS lands are needed for roads is a Highway Easement Deed. See Directors Order and Reference Manual 87.

## PROCEDURES

The following information concerns procedures for issuing right-of-way permits and is meant to give step by step how-to-do-it assistance to right-of-way coordinators at the park level.

### Administrative Record

The right-of-way process starts with the initial request for a new right-of-way, or the expiration and request for the conversion of an existing document to a right-of-way permit. This initial document will become the first page in an administrative record that must be established and maintained for each right-of-way permit. The administrative record will record the step by step managerial decision process as well as all applicable documentation as the right-of-way permit proceeds from inception to final completion. This file will also contain amendments, notes, references, and renewals as they occur.

### Initial Steps

The right-of-way process starts when the park either receives a letter from a utility company requesting the use of park land or, in the case of renewals, notifies a company when its current document allowing a use is about to expire.

The Application The information needed by the park manager to make at least a preliminary evaluation of a new use is usually obtained from a formal application. Park managers shall require applications for right-of-way permits be submitted on a Standard Form SF 299. A copy of this form is attached here as Exhibit 8. It is provided without headers or footers to allow duplication for immediate use. The information requested on the form may not be all that is needed for park managers to arrive at a decision on accepting or denying the application. Additional information may be requested from the applicant as necessary.

The SF 299 is a multi-agency form and the reference to "Transportation Systems" is typically for use by the other agencies. The SF 299 may also be used for right-of-way permit renewals or conversions from other inappropriate instruments as needed.

The Drawing As part of the application process, and in addition to or in place of the requirements on the SF 299, the applicant shall submit an original and two copies of a metes and bounds drawing that shows park features and the route of the proposed line. The original and one copy remain in the park. The remaining copy will be attached to the permit sent to the Regional Office for approval and signature. See Exhibit 1 for recommendations on what the drawing should include.

Compliance Documents Environmental and Cultural compliance is a required preliminary step in the right-of-way permitting process. In Alaska, an evaluation of the effect on subsistence uses is also required (See Appendix 15). An Environmental Assessment, and especially in historic areas, a

Cultural (106) Assessment, will be prepared (by the requester of the use or the park, park's choice) and submitted to the park for approval. This holds true in every instance when the resource is disturbed or affected and the use is not covered under a categorical exclusion. The park must have an approved environmental/cultural document, or a statement (probably a FONSI) citing one of the categorical exclusions. These statements or documents must be filed in the individual permit administrative record.

Requirements contained in Regional Office approvals of the compliance documents should normally be inserted in the final ROW permit as stipulations or required special conditions to control activities during the construction or operational phase of the project.

Preliminary Requirements Checklist Once these decisions are made and approvals or denials received, the park manager should then have made a determination, and/or have a written document in the administrative record, for each of the following items:

- A managerial finding that the activity will not be an impairment or derogation of park resources or values, and is not incompatible with the public interest.
- There is a specific law that authorizes the ROW.
- The park determines that the use is a categorical exclusion, or has an approved EA with a signed FONSI (or EIS as appropriate) from the regional office for NEPA compliance.
- The park has received Section 106 approval from the regional office for cultural compliance as applicable.
- In Alaska, park managers have evaluated the effect on subsistence uses in compliance with ANILCA 810.
- The park has received a satisfactory metes and bounds drawing describing the proposed ROW.
- The park has determined that the applicant is or is not exempt from fees and/or charges, and exactly what the fees and charges will be.

Once all of these preliminary requirements are satisfied, the park can move on to the next step, actual construction of the draft right-of-way permit.

**Constructing the Permit**

The right-of-way permit number will appear in the upper right corner of the first page of the document. The number will be constructed so that every permit written in a park will have its own

unique number. To accomplish this, the permit number will be a four part alpha/numeric combination constructed as follows:

The first part will be a two letter designation indicating the type of permit, in this case **RW** for right-of-way. This is done mostly for quick reference but is still considered a part of the number.

The second part will be the four number organization code for the park. For example, Natchez Trace Parkway would be **5570**, Big Bend would be **7130**, and Redwoods would be **8480**. This is done exclusively for the benefit of the appropriate regional office to aid in tracking the individual park permits.

The third part will be the last two digits of the calendar year in which the permit is or will be signed, for example **99**. This is done to help track when the permit was initiated.

The last part will be the three digit suffix exclusive to the next consecutive permit issued in that park. For example, the first permit issued would be 001, the fourth would be 004, the twenty ninth would be 029 and so on. The main purpose for this will be to assign a permanent and unique number for each permit written in that park. Here are some examples. The number for the second permit issued in the park (in this case let us say a right-of-way issued by Redwoods) in CY 1999 would be: **RW 8480-99-002**, and the last permit issued in the park during that calendar year, in this case another right-of-way, was: **RW 8480-99-029**. If the first permit issued during CY 2000 happens to be a right-of-way, the number would be: **RW 8480-00-030**, the next consecutive unique number for that park.

These numbers apply to newly written permits, either from a new request for a use or conversions from other types of permits. Amendments, renewals or other actions taken for existing permits would not normally be reason to write a new permit and therefore not require a new number. Each existing permit would therefore retain its original and unique document number. It is conceivable that once assigned, a document number could, through continual renewals or amendments, continue in effect and existence for the life of the park.

If the permit represents a conversion from another type of permit to a right-of-way, it should reference the replaced permit number(s) by placing the following immediately under the ROW number:

**RW 8480-00-031**
**Replaces SUP 8480-88-0014**

<u>The WHEREAS Statements</u> on the first page are used to first identify the parties to the agreement and the specific use authorized, then continue with the same type statements listing the authorities and findings that allow that use.

The Authorities Every use must cite the U.S. Code Statue specifically authorizing that use. The authorities will be listed in the exact order shown in Exhibits 4 and 5. The majority of rights-of-way requested through the parks are authorized under 16 USC §79 or 16 USC §5. Parks will cite their own enabling legislation as found in their section of 16 USC.

The Legal Description is a written version of the compass bearings, distances and other vital information that describes the land the park is allowing to be used. It should be composed directly from the metes and bounds drawing submitted by the requester, tracing the use from the point where the line(s) enters to where it leaves the park. Refer to Exhibit 1 for specifications. See also 36 CFR Part 14 for regulatory requirements.

The normal right-of-way allows sufficient room for the line, plus extra feet on both sides of the line for maintenance and operation. While there are several ways a description of this area may be done, the two normally accepted are as follows:

The Standard ROW Description This is a metes and bounds description tracing the perimeter of the right-of-way. It describes all of the land the park is including in the right-of-way. Using this method, you are not describing the actual centerline itself, but rather the entire area of the right-of-way (XX feet wide by YY feet long) including the extra room you have granted to allow space for installation and operation. The described area winds up looking like a rectangle with the actual line running through the center of it.

A Centerline Description This is a metes and bounds description of just the line itself as it travels through the park. The preliminary, opening statement must include how many feet to either side of the described centerline you are allowing for the actual right-of-way. The legal descriptions in Exhibits 4 and 5 show examples of this preliminary language describing the amount of land to either side of the centerline.

While either method is acceptable, both have advantages and disadvantages. If the park has or is going to have a functioning GIS system, and is going to include rights-of-way as an overlay, the first method is preferable because of its accuracy. However, the standard right-of-way requires an official survey that might become expensive, especially if the area covered is extensive, has difficult terrain, and/or there are several lines to be done. A centerline drawing can be done by the Permittee engineers using county base maps, a brunton compass and a measuring wheel. Regardless of which type of description is used, the Permittee is responsible for all costs associated with generating the required drawing.

In some instances, the requested use is for multiple rather than a single line. If the lines are to be placed parallel with each other and in the same trench, or all within the "standard" width decided upon by the park, they could be described as multiples of a single line and charged by the line. If the lines are more widely separated they may be treated as different parcels of the same permit. Additional lines, added at a later date, would require the company to submit new compliance documentation and pay additional fees and charges for the additional line(s).

Park managers should ground-truth legal descriptions submitted by applicants where possible or practical.

The Effective Date states the term of the Permit. Although the term of a right-of-way might vary depending on type, the permit should not be written for longer than ten years. While the NPS has the authority to issue a right-of-way for longer periods, management plans and changing land values currently dictate otherwise. Exceptions to this practice will be dealt with on an individual basis at the regional level.

The Fees For Use and Occupancy and Reimbursement of Costs. In general, the fee or non-fee determination is made depending upon the Permittee and the use. 36 CFR Part 14 contains regulations on Fees and Reimbursement of Costs. See Exhibit 2 and Chapter 10 for a description of how to determine Fees and Costs.

Under current legislation, the application, administrative and management costs are retained in the park. The fee for use and occupancy is sent to the general fund. While it is recognized that the present system does not offer great incentive to collect these fees, this should still be done for several reasons. The establishment and collection of these fees and charges will assure that holders of right-of-way permits pay all costs incurred by the NPS and be assessed full value for their use of public lands. It is the most equitable method of ensuring that all users of park land are charged equally for similar uses. It will also serve as a deterrent to an applicants turning to the NPS for a low or no cost right-of-way rather than exhausting all other alternatives first. Cost recovery figures will be based on actual costs. Fees for land or facility use are based on appraised value or comparability surveys.

The Terms and Conditions of the permit must protect and provide for the prevention of impairment or derogation of park values and resources. The terms and conditions found at 36 CFR Part 14 will be used in all permits (boiler plate) as applicable. In addition, each park should develop their own set of park specific conditions unique to their area and needs. Specific conditions might have to be added or deleted, depending on the situation.

The Hold Harmless Clause has been approved by the Washington solicitor and will be used in all ROW documents written for commercial companies (See Exhibit 4 Condition 23). Documents written for State, County and local government agencies might have to modify this statement (See Chapter 9). This however, will be done on a case-by-case basis on the advice of your Regional Solicitor's office. Rights-of-way written for other Federal agencies do not normally need this clause. Instead the park will substitute language taken from the Tort Claims Act (28 U.S.C. 2671).

> The (agency) agrees to be responsible for administration and/or payment of any and all claims for property damage or personal injuries which may arise out of the activities authorized by this Agreement in accordance with the provisions of the Federal Tort Claims Act.

Other Clauses The Terms and Conditions section is also where the park should insert other standard clauses such as an insurance clause, a performance bond clause, an Anti-Deficiency Act clause, a bankruptcy clause, and other similar language as needed. See Chapter 9 for examples.

The Signature Page The final page of the right-of-way permit should be restricted to the WAIVER NOT CONTINUING and the signature/date statements. This placement has several advantages, not least of which is use of this all-important page as a top or final sheet for the administrative record. In addition, this fully signed page is all that is needed to send to the Regional Office as proof of a fully executed document rather than another entire copy of the permit, should the region require and retain separate records.

Because this page might very well stand by itself, the right-of-way permit number should be inserted into the "IN WITNESS WHEREOF" statement as shown in Exhibit 4.

**Powerlines and Raptors**

The U.S. Fish and Wildlife Service (FWS) has drawn attention to a serious problem in some areas associating a threat to large raptors with powerlines. Raptors are attracted to powerlines as they serve as perches for hunting, resting, feeding and for territorial defense. Some powerlines are constructed with conductors and groundwires close enough together that raptors can touch them simultaneously, causing electrocutions. These electrocutions tend to effect the larger birds mostly in non-forested areas (grasslands, shrub-lands, park-lands). The larger birds are effected more because they have a greater likelihood of touching two components at the same time, and these electrocutions tend to occur more frequently in non-forested areas because the birds have no other options for perches.

If the park has large raptors and overhead power lines, walk the lines to search for evidence of raptor mortality due to collisions with the lines and electrocution. If the park finds evidence of mortality by probable electrocution, the park should meet with the utility to explore some of the existing mitigation methods. Many utility companies and some parks are already aware of these problems and have taken steps to mitigate them.

If the park does find evidence of raptor mortality, meets with the utility but the company refuses to agree to mitigating measures, the park should preserve the electrocuted birds as evidence and, at some point, if circumstances warrant, consider criminal sanctions under the Bald and Golden Eagle Protection Act, the Migratory Bird Treaty Act or the Endangered Species Act. Those Acts might come into play in the event the park determines the cause of death to be electrocution and cannot negotiate a reasonable solution with the utility company. At that point, the regional law enforcement specialist/special agent and solicitor should be asked to assist the park. The park may also contact the FWS special agent for that area for coordination, additional support and advice.

If Parks are writing or updating a power line right-of-way permit and have large raptors either in residence or as a stop on their flyway, they are encouraged to add an additional condition in their permit saying: "Utilities constructing or operating overhead powerlines will adhere to raptor safe guidelines as identified in SUGGESTED PRACTICES FOR RAPTOR PROTECTION ON POWERLINES: THE STATE OF THE ART and MITIGATING BIRD COLLISIONS WITH POWERLINES: STATE OF THE ART IN 1994." These works may be obtained through the Edison Electric Institute.

## Conversions

Conversions of or permits for existing utility lines, with no changes to the line or use, are excluded from NEPA and probably cultural requirements unless the activities prolong existing or create new adverse environmental and/or cultural impacts. Right-of-way permits representing a conversion from another document are submitted to the Regional Office for review and approval. Upon Regional approval, the right-of-way permit is sent out for company signature and returned, then signed by the Superintendent. See Exhibit 3 for Sequence of Events.

Undocumented utility lines, while not the normal occurrence, do exist in the parks. A line that has been there undiscovered for some time would, to a certain extent, be treated as a conversion because, even lacking a permit, it is an existing fact and has probably been that way for some time. If the park decides to allow the line to remain, a right-of-way permit will be prepared and submitted as described above for final execution by the Superintendent. Caution is advised when dealing with these obviously old but newly discovered lines. There is a chance that the utility line was in place prior to the park obtaining ownership of the property. To find this out the park should check it's deed file. If the line is mentioned in the deed of acquisition as an encumbrance on the land being sold to the NPS, it is a deeded easement and does not require a row permit. If the line is not mentioned in the deed, the park should query the utility company asking for some documentary evidence why it is there. Most of the time, the company is able to produce documentation showing purchase of the row through the previously owned private property. In those cases, even though the line is not mentioned in the new NPS deed, it pre-existed the parks purchase and as such is a prescriptive easement and will be so recorded in the park administrative record.

There will also be occasions when a company, for whatever reason, constructs a **new** line on park lands without notification or documentation. Mistakes like this are made with surprising frequency, especially by new utility companies, or those not used to dealing with Federal government lands. The park should halt any construction still underway and contact the company immediately, informing them of the intrusion (trespass) and exploring the various actions to be taken.

## Review and Approval

The WASO solicitors have stated that specific right-of-way permits that follow the standard approved format and do not contain sensitive or potentially controversial material, do not require

solicitor review. Regional special park use managers should check with their solicitors to confirm this policy. The right-of-way permits shown as Exhibits 4 and 5 are the approved formats.

All *new* right-of-way permits must be submitted to your Regional Office for review, approval, and ultimate execution by the Regional Director. If the permit is a conversion or renewal of an existing permit, it will be reviewed and signed by the Superintendent.

If the right-of-way permit being submitted for review and approval required NEPA and/or Cultural resource compliance and approval, the park will include copies of the approved compliance documents (NEPA Categorical Exclusion, EA/FONSI, EIS/Record of Decision (ROD), and 106 compliance, as applicable) with the package. In all instances, the originals of the compliance documentation should remain in the park.

## Right-of-Way Amendments

If, during the term of an existing permit, a significant number of Amendments have been written to the same permit, or if the proliferation of amendments become confusing, the park may write a new permit incorporating all of the changes. The new permit would be treated as a conversion. The park could either continue the same term as the existing permit or start anew. Since the main purpose of writing the new permit is simply to consolidate the proliferation of amendments, the park might even consider keeping the same permit number if that is desirable for purposes of continuity.

The original ROW permit number is shown on the upper left side of the face sheet with the "Amendment Number" immediately below it. The date of "Issue" and "Expiration" of the **original** permit is shown on the upper right portion of the face sheet. The approved amendment becomes a part of the original permit and will expire (and be renewed) at the same time as the original permit.

The first paragraph identifies the permit involved, the permittee, the original use permitted, and the purpose of the amendment. The second paragraph gives details of the change. The third paragraph is a statement showing the specific use the amendment authorizes. The amendment should include a statement that all terms and conditions (other than those changed by the amendment, if applicable) remain in effect. If needed, a legal description and/or extra conditions may be added.

The amendment follows the same review and approval procedure as a normal right-of-way conversion. Parks will attach a copy of the original approved and signed right-of-way permit to the amendment when submitting same for review and approval. Copies of any **new** compliance documents or drawings dealing with the amendment, will be attached as well.

All documents associated with the amendment will be added to the Administrative Record of the original ROW permit. A ROW amendment is executed by the Superintendent.

One of the more common types of amendments for utilities deals with the replacement or addition of another line within the same right-of-way already authorized. The most common question associated with this type of use is whether or not to charge an additional fee for the amended use. The following statements are adopted as correct procedures.

> If a utility company is replacing an existing line/pipe within an already authorized right-of-way on a one for one basis, even if the old line is to be abandoned in place and the new line laid over it, no **additional** charge should be levied for the new line. This is considered normal maintenance and authorized. However, and especially in historic parks, the digging involved might require 106 cultural and NEPA compliance, especially if the construction zone will extend beyond previously disturbed ground. The company would be responsible for any costs incurred by the park for these activities.

> If a utility company is adding a new line(s) within an already permitted right-of-way, the park should charge the established fee for the fair market value for the new line. This fee would be in addition and added to the fair market value fee already being charged for the existing line(s). There would be no additional charge for monitoring. 106 cultural and NEPA compliance may be required and may incur additional administrative costs.

If, as in the first example, the new line is considered maintenance (a one for one replacement in the same trench), a note should be made in the administrative record detailing the work and noting any changes made. If the new line is in addition to the existing line(s), the park should prepare an amendment to the right-of-way permit.

Amendments may also be used for those instances of change of ownership or mergers of companies. All that is being amended in those instances is usually the name and address of the new permittee, and a statement that they are taking over full control of and responsibility for the row (from XXX the previous holders of the row) and agree to abide by and follow the established conditions. Their signature on the amendment binds them to those statements. Additional language may be inserted as needed, but those would be the core concerns.

## Right-of-Way Renewals

As in any other type of document up for renewal, the park will review the administrative record. This review will include, but not be limited to, the continuing appropriateness of the use, its continuance as not impairing or being in derogation of the resources or park values, as well as a comparison of the documented fees and the latest appraisal for similar use. If the results of this review show no changes or differences from the original document, and the only concern is that it is about to expire, the park may renew it by use of a ROW Amendment. If there have been other amendments along the way that, after review, have already been attached to the document, the

Amendment(s) will remain valid.. The Amendment of renewal in particular and any references to the document in general, will specify the existing Amendment(s) as still being in effect.

If a document is up for renewal and the only difference is that the fair market value or other charges have increased or decreased, the change may be recorded on the Amendment of renewal. This is not considered a significant change.

If there have been or will be significant changes to the original permit, over and above those included in the amendment(s), the park will proceed as if this was a conversion of an existing document and write a new ROW permit, with a new number, based on the old document and the amendment(s). If desired, the park may petition the Regional Office to retain the original permit number for administrative reasons. Examples of a significant change would be the relocation of the original line well outside the established ROW, or a major change in the quantity of the line(s). Note that a change in the line character or location could require new environmental and cultural approvals.

If no significant changes are evident, the park may proceed with the renewal process. This process should start at least six months prior to the expiration of the original ROW.

- The permit number will be the same as on the original row permit with the addition of the consecutive amendment number. Example: RW 4290-92-005A1 (where A1 refers to Amendment # 1)

- The term of the new permit will not exceed ten years, or whatever term is current at the time of renewal.

- The first paragraph will state that the intention of the amendment is for the purpose of renewing the ROW permit. Example:

    Right-of-Way Permit RW XXXX-XX-XXX, issued (date) to the (Company), and describing existing (type of use), is hereby amended to renew the term of the Permit for an additional 10 years from the date of expiration shown above.

- A simple renewal, without major changes, is treated as a conversion and as such is categorically excluded from NEPA compliance. This should be stated in the second paragraph.

    This renewal is categorically excluded from NEPA compliance under 516 DM 6, Appendix 7, Section 7.4, Paragraph A (5).

- Any additional changes or stipulation would follow, such as any increase or decrease of the fees and/or charges.

A draft of the amendment, along with a copy of the original ROW permit, and all pertinent documentation, will be submitted to the Regional Office for a review.

Upon Regional Office review and approval, the amendment is typed in final and submitted to the company for approval and signature, then to the Superintendent for final execution and implementation.

## Rights-of-Way for Telecommunications Facilities

A right-of-way permit will be used for permitting the siting of telecommunication services facilities on NPS property. The guidance and approved procedures for this process are attached here as Exhibit 6.

## REFERENCES

16 U.S.C. 1a-1
16 U.S.C. 1b(2)
16 U.S.C. 1b(4)
16 U.S.C. 1b(7)
16 U.S.C. 3
16 U.S.C. 3a
16 U.S.C. 4
16 U.S.C. 5
16 U.S.C. 8
16 U.S.C. 79
16 U.S.C. 3161 (ANILCA)
23 U.S.C. 317
28 U.S.C. 2671
31 U.S.C. 9701
40 U.S.C. 481
43 U.S.C. 1734 (FLPMA)
36 CFR Part 14
36 CFR Part 61
40 CFR Part 1500
43 CFR Part 36
43 CFR Subpart 2808
NPS Management Policies 1988
OMB Circular A-25
NPS SPECIAL DIRECTIVE 91-5 (7/3/91)