# WIRELESS TELECOMMUNICATION FACILITIES

## INTRODUCTION

This Exhibit sets forth the procedures applicable to permitting Wireless Telecommunication Facility (WTF) sites in units of the National Park System. These are service-wide procedures unique to WTF sites and are in addition to the requirements and procedures in Appendix 5 (Rights-of-Way) and other applicable sections of RM-53.

The procedures described in this Exhibit apply only to applicants holding FCC licenses for wireless telecommunication services as described in section 704 (c) of the Telecommunications Act of 1996, Public Law 104-104, and superintendents will work with such applicants to satisfy the requirements of that Act, Director's Order 53 (Special Park Uses), and 36 CFR Part 14. Only FCC licensees can apply for WTF permits.

## OVERVIEW

The following is only meant to be a brief summary or overview of the WTF application and permitting process. For full procedures containing detailed explanations, managers should read and follow the **PROCEDURES** shown below this section when dealing with this subject.

PRE-APPLICATION

- Preliminary review of policy, regulations and park specific requirements by the unit staff.
- If appropriate, schedule preliminary meetings with applicants (or potential applicants if known), advising them of requirements and information the park will need to process their application.

RECEIPT OF WRITTEN APPLICATION (120 business day clock starts)

- The park has up to 10 business days from receipt of application to acknowledge such receipt and indicate in writing whether the park's answer will be a yes, no or maybe. (See page A5-54 for detailed explanation.) If for some reason, the park manager is unavailable to make this decision, that fact will be noted in the Administrative Record, and the 10 business day clock will recycle until the manager returns or the manager's designee makes the decision. The applicant will be notified of the delay and that notification will also be recorded in the Administrative Record. However the 120 business day clock does not stop. This also satisfies the GSA requirements imposed on all Federal agencies.

- If the answer appears that it will be no, the park invites the company in to explain it's objections and offers a chance for mitigation if such exists. If mitigation is not possible, the park details the reasons in writing.
- If the answer appears that it will be yes or maybe, the park acknowledges that in writing and invites the company in to discuss the next steps.

- On or before day 10, perform the following simultaneous actions:
    - notify other Telecommunications companies in area
    - initiate NEPA/NHPA compliance (applicant pays all costs)
    - determine appraised or comparison value fee amount
    - estimate of costs to applicant
    - initiate FOTSC technical review and analyze resultant comments upon receipt
    - other as needed

- On day 60 EA received
    - initiate public comment period
    - publish notice in Federal Register

- On day 90 - 100 park staff review of all submitted comments
    - analyze compliance documents to issue FONSI or require EIS
    - consider mitigation of needed
    - reconsider FOTSC comments
    - consider public comments
    - consider other factors as applicable

- On day 100 park makes final decision
    - if final decision appears to be no, park will meet with company to explain reasons and discuss possible mitigation. If no mitigation possible, park will issue written final negative decision with reasons.
    - if final decision is yes, park will type ROW permit in final and send to company then regional office for signature.

- On day 120, permit should be issued and in effect, copy of signed permit sent to FOTSC for technical record purposes.

**GUIDANCE**

When considering the potential or dealing with an actual request for a WTF site(s) on park property, the superintendent should consider these points.

- Superintendents who have or expect to receive multiple requests for WTF sites will encourage co-location where possible.

- ROW permits will only be issued for those requests for which there is no practicable alternative and will not result in a derogation of the resources, values and purposes for which the park was established.

- Except as specifically provided by law or policy, there will be no permanent road, structure or installation within any study, proposed, or designated wilderness area (see Wilderness Act, 16 U.S.C. § 1131). The NPS will not issue any new right-of-way permits or widen or lengthen any existing rights-of-way in designated or proposed wilderness areas. This includes the installation of utilities.

- Superintendents will only accept applications for a WTF site from a Federal Communications Commission (FCC) licensee authorized to provide the service.

- The public will be given the opportunity to participate fully and comment on applications for right-of-way permits to construct WTF sites on park property.

- Superintendents may wish to quickly identify critical resource areas, operational needs, and existing infrastructure. This is a completely optional process. Such an effort is intended only to provide basic, preliminary information so as to expeditiously inform the park manager about potentially suitable WTF sites, or areas where WTF facilities may not be approved. This process is NOT conducted in lieu of coordinated NEPA-NHPA compliance. If conducted at all, it may be done prior to or after receipt of a complete application. It may be most appropriate when the park has or expects to receive multiple applications for multiple sites, or in parks that encompass large or geographically dispersed acreage, variable topography, or complex resources. It should be accomplished by park staff as appropriate. This exercise may also be used by the park manager to open a dialog with the potential applicant(s), or for any other reason the manager deems appropriate.

- The superintendent assures proper compliance (for instance NEPA, NHPA, etc.) is accomplished for each WTF application. Compliance may be performed by park staff or contractor; the applicant is responsible for payment of all compliance costs regardless of who performs them.

- Parks may use standard procedures to determine the land and/or facility use fee for WTF sites.

- Parks will encourage meetings with WTF applicants at any time during the decision making process as necessary, particularly if the park is considering denying the application. In such instances, the applicant will be given an opportunity to discuss the pending application and the park's concerns before a final decision is made.

- Parks will consider the safety of the visiting public as a factor when reviewing WTF applications. Public safety, in this context, refers to telephonic access to emergency law enforcement and public safety services.

- To the extent possible, where an EA may be sufficient to satisfy NEPA compliance, parks should seek to complete the environmental review process within 120 days of receipt of application. To the extent possible, if an EA reveals a need for an EIS, this additional process should be completed within 12 to 18 months of receipt of application. If for some reason, delays occur or are expected to occur in either the EA or EIS process, the park should inform the applicant of the probable delay, the reason(s) for it, and discuss an expected time frame for completion.

## PROCEDURES

The following procedures are for normal applications for WTF sites.

### Pre-contact Preliminary Actions

The appropriate activities for a park regarding potential WTF site(s), prior to receipt of an application for a right-of-way permit by an FCC licensee authorized to provide wireless communications services within the park's boundaries, include:

- Familiarization with NPS policy on and procedures for reviewing applications for WTF sites;
  - NPS Management Policies (8.6.4.2)
  - D.O. 53
  - 36 CFR Part 14
  - The Right-of-Way Permit Template

- Review appropriate park planning documents, and specifically any documentation of the unique resource issues concerning the park which will bear on its determination of whether proposed WTF sites will result in a derogation of park resources, values and purposes, and;

- Where a park is aware of multiple WTF providers having an interest in the same park area, the park may initiate a meeting to encourage co-location of sites. This would have the effect of consolidating the multiple entities the park has to deal with for compliance and other re-

views. Each company on the same tower would ultimately receive its own right-of-way permit.

- Parks should develop a mailing list of potential interested parties. This list should include all FCC licensed wireless telecommunications companies within the area, as well as those other parties who have demonstrated their interest in this or similar concerns over the years. To obtain the list of FCC licensees in your area, write to:

  (Irene Griffith)
  Federal Communication Commission
  Commercial Wireless Division
  445 12th Street SW Room 4-C132
  Washington, DC 20554

  Or call (202) 418-1315. Specify the City, County, and State you are asking for and list your name and phone number or email address they can reply to. Also specify what type of service has applied: PCS, Cell Phone, FM Radio, etc.

- Parks should develop a listing of consultants or companies from the surrounding area or those willing to travel to the area, capable of compiling NEPA and/or NHPA compliance to the park's satisfaction. This list would, at their request, be given to applicants for WTF sites for selection to complete the required compliance document(s).

Except for the above items, parks should avoid spending significant time or resources with interested FCC licensees until the licensee has submitted an application for a right-of-way permit.

**Initial Contact**

Once a park has been contacted by an FCC licensee authorized to provide a wireless communications service, the superintendent should inform the Licensee of the requirements of applicable laws, NPS policy, these procedures, and 36 CFR Part 14 for obtaining a right-of-way permit. In addition, the potential applicant should be advised that information submitted in applications for rights-of-way are subject to disclosure under the Freedom Of Information Act (FOIA). All applicants must advise the park whether they consider any of the information they are being asked to submit as being protected information containing trade secrets or confidential, commercial, or financial information exempt from disclosure under FOIA. Superintendents, after review of the material claimed for protection from public disclosure, may request a justification from the applicant to assist the superintendent in making a decision pursuant to the FOIA. Further guidance on this subject may be obtained from the Solicitor's office and/or the FOIA officer.

The superintendent may discuss proposed sites with the licensee to determine which zones, areas, locations, and types of installations are likely to not result in a derogation of park resources, values and purposes.

Superintendents should review the location of existing utility systems and roads. If utility service and access to the proposed site is already in existence, the park must consider what additional impacts the proposed use might cause and the possibility of additional utility rights-of-way needed. If access to the proposed site is not in existence, the park must evaluate what impact construction of an access road connecting existing roads with the proposed site would have, as well as the required additional utility services. **The potential applicant should be made aware that the NPS decision process considers the full footprint of a WTF site: The tower-antenna-base structure facilities; the access road required for construction and service; and the supplying power and telephone lines.** Should any of these disparate parts be found to cause unmitigatable impacts, the entire application would be denied.

Superintendents should provide an estimate, to the extent possible, of the anticipated timetable for processing a right-of-way application and permit if the WTF site is approved. An estimate should also be provided, if possible, of the anticipated costs, including the land and/or facility use fee required pursuant to 36 CFR Part 14. A formal appraisal or comparability determination, however, should wait for receipt of an application for the use.

If the requested use is to place an antenna on an existing tower already under NPS permit (co-locate), then the applicant must first obtain permission, in writing, from the existing permittee. After such permission has been obtained, the applicant must then apply for a separate right-of-way permit from the NPS by following the applicable procedures listed below. A copy of the written permission referred to above, shall be attached to the formal application.

## Application Form

An application is the first formal notice that the applicant is requesting use of park property. Generally, the applicant may be asked to submit a minimum of four copies of the Application depending on individual park requirements (one for the Administrative Record, one for the park's files (if different from the Administrative Record), one for the Field Operations Technical Support Center (FOTSC), and one for other review purposes if required). The park must use "STANDARD FORM 299 APPLICATION FOR TRANSPORTATION AND UTILITY SYSTEMS AND FACILITIES ON FEDERAL LANDS" as their application form. This form has been included in this Appendix as Exhibit 8. It is presented there without headers or footers for ease of reproduction. Electronic versions of this form may also be requested from the Regional right-of-way coordinator and are also available on the Internet through the BLM homepage. While the form covers the basic information needed, some parks may need additional de-

tails to cover special concerns. This additional information should be specifically requested as attachments to Standard Form 299. The information or requirements listed below should be considered as fundamental for all applications.

- Full description of the requested land or facility use in the park, including proposed number of sites, types of sites, equipment and antennas (including structures) to be located at each site, required new (or modification of existing) electrical and telephone service for each site, location of the sites in the park, and existing or proposed roads to be used for access to the proposed site.

- Maps showing the "before" and "after" service levels and signal strength for the proposed WTF site(s).

- Maps showing all other WTF sites and their coverage operated by the applicant up to a 15 mile radius (or other distance determined appropriate by the superintendent).

- Propagation maps from the applicant showing its proposed buildout of sites within a 15 mile radius of the proposed site within the next five years (or other distance or time frame determined appropriate by the superintendent). Note that this information may be exempt from disclosure under FOIA.

- For each proposed site, a schematic site plan and elevations showing the equipment and antennas to be installed, including supporting structures, connections to telephone and electrical service, and how the applicant will access the site for construction (with a list of construction equipment to be used) and ongoing maintenance.

- Copy of the FCC license authorizing the applicant to provide wireless telecommunications services for that area, along with a map showing the boundaries of the authorized service area and the relationship of that area to the park's boundaries.

- Payment of the one time application fee required pursuant to 36 CFR Part 14 (minimum fee $250.00 for WTF sites), and submitted with the completed application.

- A realistic photo-simulation acceptable to the park depicting what the proposed WTF(s) and access, if applicable, would look like after installation.

## Receipt of Written Application

Receipt of a written application and application fee in the park starts a 120 day clock. Note that in every instance, this refers to business days (normally Monday through Friday). See further discussion of the time schedule below. NPS policy requires that to the extent possible, where an EA may be sufficient to satisfy NEPA compliance, parks should seek to complete the compliance and permitting process within 120 days of receipt of an application. Should delays occur or be expected to occur, the park must inform the applicant of the probable delay(s) and discuss an expected time schedule.

The procedure below assumes there are no delays, the information received is sufficient to go on the next phase, and all steps are completed satisfactorily. Should this not be the case, the step must be repeated and the time clock resets to the beginning of the current step or a time frame suitable to accomplish the work needed. The superintendent will, pursuant to the Telecommunications Act of 1996, D.O. 53, Deputy Director Galvin's memorandum, and these Procedures, take the following actions:

- If the park determines that more applications for a particular WTF site have been received than can be accommodated at that location without impairment or derogation of park resources, values or purposes, then the park may conduct a sealed bid process using the applicable GSA or other procedures to select the applicant(s) who will then be allowed to submit the additional compliance documentation to obtain a right-of-way permit.

- Develop an Administrative Record documenting all work related to review of the Application. Include all prior contacts with applicant if relevant.

- Within the first 10 days after receipt of an application, the park will use the submitted material to come to an initial decision whether the park's answer will be yes, no or maybe. Then, by no later than the end of that initial 10 day period, the park will acknowledge receipt of the application and indicate the park's initial decision in writing to the applicant. Experience in the field has shown that those requests that are a definite "yes" or "no" are usually relatively obvious. For instance, a request to co-locate an antenna on an existing tower in previously disturbed ground, or on top of a building where there are already other antennas and an established service road and utilities, would normally receive a "yes" answer unless there are unusual circumstances. Equally, a request to site a new antenna on top of the Washington

Monument, Half Dome, or in a wilderness, for instance, would normally receive a "no" answer, again unless there are unusual circumstances. Everything else would be "maybe," including those cases of unusual circumstances mentioned above. It is expected that the vast majority of applications (probably better than 90%) will fall into the "maybe" range. That is why the initial decision period is only a maximum of 10 days. This decision does **NOT** say we will issue a permit. It is only to decide whether the answer to the request is obviously *yes*, or *no*, and if not one of those, then it's *maybe*, and this decision can usually be done very quickly.

- If it appears that the request will be denied, the park invites the company in to explain it's objections and offers a chance for the company to come up with mitigation if that is possible. This is done **PRIOR** to issuing a written denial. If mitigation is not possible, then the park details the reasons in a written denial to the company.

- If the answer appears that it will be yes or maybe, the park acknowledges that in writing and invites the company in to discuss the next steps and the time frame involved.

- Following a "yes" or "maybe" decision, and no later than 10 days after receipt of the application, the park will perform the following simultaneous actions. Note that the more expeditiously the park moves on the early (easier) steps of this procedure, the more time it allows itself to complete the more complex ones later.
    - mail notice to the park's list of potential interested parties advising of receipt of application, if the park has developed such a list, or by posting a notice of receipt of application for a WTF site in a newspaper of general circulation in the affected area and/or in the nearest metropolitan area newspaper. The purpose of this notice is to notify other FCC licensees authorized to provide wireless communication services within or adjacent to park boundaries, and to promote public and local governmental participation. By these methods, the park will notify other Telecommunication companies and other interested parties in the same area of receipt of the application. This action is strictly a courtesy notification mostly aimed at other telecommunication companies who might have similar interests, not a request for comments. Responses, if any, must reach the park within 10 days of the notice being published.
    - If the park chooses not to do all or any part of it in-house, send a written request to the applicant to initiate NEPA, NHPA and/or any other compliance required by either performing their own or choosing one or more of the companies on the established list of consultants acceptable to the park. The park will be the approving official for

any compliance documentation developed. All compliance documents must be completed prior to day 60 after receipt of application.

- Initiate action required to determine fee for use of the NPS land or facility requested in the application, unless this fee has already been determined. This may be accomplished by appraisal or by comparability with similar fees in the surrounding area.
- Initiate FOTSC technical review. The park will send a copy of the application and all drawings showing RF coverage, location of tower and or antenna array, and other information needed to base a technical opinion on, to the Chief of Radio Frequency Management, FOTSC, Denver, to initiate a technical review. The FOTSC review will determine if the proposed use will conflict with communications facilities and technologies, not only for the currently applied for use, but those applications proposed in the future as well.
- Initiate any other process needed to determine presence or absence of impairment or derogation of resources, values or purposes for which the park was established.
- Meet with park staff to determine estimate of current and projected costs required for the permit approval process.
- Meet with applicant to advise current stage of progress as well as costs and fee estimates for remainder of process.
- In addition, the applicant will submit the following information:
  - Documentation as to how the applicant will prevent the proposed WTF site from causing interference with other existing sites operated by the Service or other private parties, either in or adjacent to the park.
  - A study prepared by an independent licensed electrical engineer calculating the non-ionizing electromagnetic radiation (NIER) which will result from the proposed WTF site (each site for multiple-site applications), and also the total NIER for co-location sites or the site in combination with nearby sites, and a statement comparing these figures and stating that the proposed facility will meet applicable NTIA standards for reducing radiation hazard to a harmless level. Note that if the proposal is approved, the resultant right-of-way permit should require that the actual NIER should be measured by an independent licensed electrical engineer after the wireless communications facility site(s) has commenced operation. A copy of the study described above, as well as any resultant reports, must be sent to the FOTSC, Denver files.

- On or before day 60 after receipt of application, all compliance documents are completed and received in park. If complications arise that delay completion of the document(s), the park and the applicant shall meet and discuss a possible extension of the time limit. Should such extension(s) be granted, the 120 day clock will pause until the documents have been com-

pleted and delivered to the park, and resume at the 60 day mark as if the delay and extension had not occurred. Such actions will be thoroughly documented in the Administrative Record.

- Upon receipt of the required compliance documentation, the park will then take the following simultaneous actions:
  - Initiate a 30 day public comment period by posting a notice in the newspapers as above and in the Federal Register of availability of the EA for comment. The procedures for submitting Federal Register Notices are as follows. First, as soon as the park determines the need to post a notice, or before if possible, contact the Federal Register Publications Coordinator (currently Debra Melton) via telephone (202 208-4578), email, or fax (202 501-6904). That person will describe the process and supply you with examples of the four required items to get something published in the Federal Register. These are: 1) An original and four copies of the proposed Federal Register Notice signed by the superintendent; 2) A diskette containing a true copy of the notice and labeled with the title of the notice; 3) A letter signed by the superintendent and addressed to - Reymond Mosley Office of the Federal Register Washington, D.C.; and 4) A requisition to pay for the cost of the publication. The cost is currently $135.00 per column. This cost is directly recoverable from the applicant.
  - Federal Register Notices are to be mailed with a cover letter to:

  Manager, Washington Administrative Program Center

  Attn: Federal Register Publications Coordinator

  National Park Service

  Main Interior Building

  1849 C. St. N.W. Mail Stop 3316

  Washington, D.C. 20240

  - The park staff will examine and analyze all compliance documents submitted, then make a finding of: a categorical exclusion; issue a FONSI; or issue a notice to require an EIS. (Should the findings require an EIS, the clock recycles to from 12 months to 18 months pending completion of that document and ROD.)

- On or before day 90 - 100, all public comments and analysis should have been received. The park will:
  - Reconsider FOTSC comments received in light of additional information as appropriate.

- Consider the public comments received.
- Consider other factors as applicable.

- On or before day 100, park makes final decision.
    - If the final decision appears to be no, the park will meet with the applicant prior to issuing a written denial of the request and explain the reasons for their decision. The applicant may suggest possible mitigation at this point. If the mitigation is acceptable to the park, the applicant may be asked to resubmit information and documentation in support of that mitigation. Should this submittal take place, the 120 day clock will recycle to this point. If no mitigation is possible, the park will issue a written denial to the applicant. The letter of denial must include the relevant portions of the administrative record detailing reasons for the denial, state that the applicant may appeal the park's decision, and include the name and address of the official to whom the appeal should be sent. Any action described in this section will be thoroughly documented in the Administrative Record.
    - If the final decision is yes, the park will document that decision in the Administrative Record then prepare three original copies of the right-of-way permit and send all three to the applicant for their signature. The applicant will examine the permit in detail, then sign all three copies of the permit with original signature, then send all three back to the park. These three signed copies, along with a cover memorandum requesting approval of the WTF site(s) and permit, a copy of the approval from FOTSC, a copy of all signed NEPA and NHPA compliance documents and all other approving documentation, is then forwarded to the Regional Director for approval and signature.
    - The regional office will retain one copy of the permit for it's files (if desired) and return two copies of the fully executed permit to the park. The park will mail one original copy of the permit to the permittee and retain the second in it's files.
    - The park will make a machine copy of the fully signed and executed permit and, with a copy of the maps and drawings, send the set to the FOTSC for technical record purposes.

**Fees and Charges**

The policies and procedures found in Chapter 10, Management of Permit Fees, and Appendix 5, Rights-of-Way, apply to permits for Telecommunications Facilities. Because of the special nature of these facilities, there may be additional factors to consider. The applicant shall also be responsible for:

- All costs associated with review and approval of the application package including but not limited to the FOTSC review, and all costs involved in posting and review of the public announcement and Federal Register notices.

- The NPS recognizes that Service and/or public benefits may result from authorizing the use of park lands for WTF sites, including consideration of the public safety. Benefits such as real property or air time, proposed by an applicant, would be treated as donations, and must be in addition to full payment of all fees and cost recovery (i.e., cannot be used to offset fees and/or charges).
- At the discretion of the superintendent, costs of review and processing may be collected from the applicant at any time during the process, for instance up front, during the approval process, or prior to execution of the right-of-way permit by the Regional Director. These costs include but are not limited to those for any special in-park assessments (if applicable), the appraisal or comparability studies, all compliance, and other costs required by the park associated with permit determination and issuance.

- The facility and/or land use fee for the right-of-way permit required by 36 CFR Part 14 must be determined and the applicant provided with that figure prior to issuance of the permit. In determining the facility and/or land use fee, parks should bear the following in mind:
    - the Service is required to determine the fair market value fee for use and occupancy of NPS facilities and/or lands. While it may be appropriate for a park to accept information on comparable fees from an applicant, (as well as other sources), the final determination of fees is solely the responsibility of the park and should reflect fair market value (excluding any figures for cost recovery or profit).
    - Parks may determine the facility and/or land use fee using sound business management principles, including but not limited to appraisal, or comparability with similar uses within the surrounding area, such as by using annually updated USFS RENT SCHEDULE FOR COMMUNICATIONS USESA (FR 68074 Dec. 30, 1997). If more than one of the above methods is employed to determine the fee, the higher figure will always be used.

## The ROW Permit

The authority for issuing right-of-way permits for telecommunication purposes is found in 16 U.S.C. 5. Requests for WTF sites will be treated the same as those for any other right-of-way in the park in that they are subjected to the same scrutiny for impairment or derogation of resources, values and purposes, including NEPA and cultural resource compliance. There are, however, major differences between WTF and other utility rights-of-way. These include the technical review and approval required by the Chief of Radio Frequency Management, Field Op-

erations Technical Support Center (FOTSC), Denver, and the possible addition of a separate access to the site for purposes of construction and operation.

The terms and conditions of right-of-way permits for WTF sites, in addition to those listed in Exhibits 4 and 5, will also reflect the Service's objectives for such sites, including but not limited to:

- creating the maximum potential for future co-location; requiring stringent visual and other mitigation measures;
- maximizing use of existing park utilities and infrastructure precluding any other use or sub-permitting by the applicant except as authorized;
- incorporating the best practices of other Federal, state, and local agencies in approving such sites on public lands;
- List specific resource protection measures and possible mitigation for the required access road to the WTF site as well as additional utilities needed to service/supply the site. These measures should include concerns during both construction and operation of the facilities.
- The permit should also contain a provision that in addition to termination for cause, it will be terminated in the event of the expiration, transfer, or revocation of the permittee's FCC license for provision of the WTF service.
- The term of the permit will be for no more than 10 years or the remaining term of the applicants FCC License, as applicable. The superintendent may recommend to the Region a waiver to lengthen the term of the permit upon request from the applicant. Such recommendation may, among other things, be based upon consideration of the cost of the facility, its useful life, impacts on visitor use, and long term affects on and/or loss of the use of park land. Both request and decision must be in writing and recorded in the administrative record.
- A draft copy of the right-of-way permit, especially the conditions, should be given to the applicant for comment.
- The permit must contain a provision that in the case of expiration of the permit, or non-use or abandonment for a length of time not to exceed two years or as determined by the superintendent, the permittee shall remove the antenna and all associated appurtenances and restore the site to it's original condition prior to approval of the permit. In addition, the permittee shall be responsible for all costs of removal of the antenna and appurtenances, and restoration of the land or facility used in the permit to it's original condition or better. This condi-

tion includes any construction, towers, buildings, access roads, and utilities involved with the original permit.

- The legal description must include the access corridor and supplying utilities as part of the WTF site footprint.

If there have been no changes from the standard form Right-of-Way Permit pre-approved by the Solicitor's Office, no further legal review will be required at the regional level. If, however, circumstances have required deviations from the standard form, the permit will require Solicitor's Office review.

Once signed by the Regional Director, the right-of-way permit is in effect and construction may begin. The park will manage the permittee's construction of its WTF site(s) according to the park and Service's standards.

## Other Considerations

For proposed sites, or zones, locations, or areas with a potential for WTF sites within a critical viewshed, either inside the park or outside its boundaries on property not controlled by the Service, the park should coordinate its review of the proposal with the interested parties (i.e., county, municipal, State, Federal and private landowners). The purpose of coordinating activities with surrounding jurisdiction would be to minimize the impacts.

Because of the potential impacts associated with WTF sites, parks need to be aware of what is happening in surrounding areas. There are a variety of special situations that might arise. One example is a park being approached for permission to install a WTF site(s) (particularly PCS or cellular service) on properties where the Service holds a scenic easement. Another example is a proposed site outside park boundaries creating a significant viewshed impact over which the Service has no control. It is entirely possible that the Service might suggest relocating the site to an acceptable location on park property where the viewshed impact would be significantly lowered. An example of this exact instance has already occurred at Little River Canyon NP.

Another example would be when a WTF is proposed for construction adjacent to park land, but the only practical access is across park land. This situation could be a relatively frequent occurrence. The key issue here is that roads in parks that are solely for the purpose of access to a telecommunication site (or any utility) but not incidental to an actual permit, are not authorized. There is, however, an interesting side issue that might apply, depending on circumstances. An access road for the purpose of first constructing, then maintaining utility rights-of-way, such as the power and telephone lines needed to service the Telecommunication Site, would be author-

ized as incidental to those rights-of-way, as described in the Exhibit above. Certainly, at least one of the factors the superintendent would have to consider when making a decision on the utility right-of-way (power and phone), would be the possible derogation from the additional traffic/use caused by the WTF site.

In special circumstances, where a right-of-way permit may not be the appropriate authorizing instrument (i.e. the Service is being asked for a modification of a scenic easement), the procedures set forth above must be followed except for the requirement for a permit. While some requirements may not apply, for example the collection of a facility and/or land use fee, it may be possible to obtain other considerations. In the scenic easement example, the Government would likely have paid a lesser price for the scenic easement if the owner had retained the right to place WTF sites, and therefore it may be appropriate for the Government to receive a portion of the rent collected by the property owner until the acquisition cost of the easement has been paid off. Another example would be where the Service approves installation of a WTF site within a scenic easement in return for the granting by the property owner of new scenic easements protecting other sensitive viewsheds.

Superintendents are encouraged to work closely with the Regional Office to respond to the issues and opportunities presented by such special circumstances.

**References**

16 U.S.C. § 5
16 U.S.C. § 79
43 U.S.C. § 1764(b)
36 CFR Part 14
Director's Order 53
RM-53, Chapters 7 and 9
RM-53, Appendix 5 and Exhibit 6
Right-of-Way Permit Template