# In the United States Court of Federal Claims

**No. 06-116C**
**(Filed: November 6, 2006)**

| | | |
|---|---|---|
| * * * * * * * * * * * * * * * * * * * | * | |
| | * | |
| **CALIFORNIA OREGON** | * | |
| **BROADCASTING, INC.,** | * | |
| | * | |
| **Plaintiff,** | * | **Application of State Law; Lease; Right** |
| | * | **of First Refusal; Option; Damages;** |
| **v.** | * | **Lost Profits.** |
| | * | |
| **THE UNITED STATES,** | * | |
| | * | |
| **Defendant.** | * | |
| | * | |
| * * * * * * * * * * * * * * * * * * * | | |

*Neil H. O'Donnell,* San Francisco, CA, for plaintiff. *Mark A. Kahn*, San Francisco, CA, of counsel.

*Marla T. Conneely,* U.S. Department of Justice, Washington, DC, with whom were *Peter D. Keisler, Assistant Attorney General* and *Director David M. Cohen,* for defendant. *Paula Lee*, National Park Service, Office of the Solicitor, Oakland, CA, of counsel.

**OPINION ON CROSS-MOTIONS FOR SUMMARY JUDGMENT**

---

**FIRESTONE**, *Judge*.

This case comes before the court on the plaintiff's motion for partial summary judgment pursuant to Rule 56 of the Rules of the United States Court of Federal Claims

("RCFC") and the government's cross-motion for summary motion, as well as the government's motion to dismiss for failure to state a claim pursuant to RCFC 12(b)(6).[1] The plaintiff, California Oregon Broadcasting, Inc. ("COBi" or "plaintiff"), contends that the National Park Service ("NPS") breached a lease agreement for a five-acre parcel of land ("Shasta Bally" or "the property") located near Redding, California, by refusing to renew the lease with COBi for the property for another fifty-year term. The NPS acquired the lease incident to its purchase of the underlying fee interest from the original lessor. COBi contends that the NPS breached the lease because the NPS did not renew the lease with COBi when the lease expired on July 31, 2006. COBi contends that the lease provided it with an option to extend the lease for an additional fifty years. The government argues that the lease did not provide COBi with an option to renew the lease, but rather that it provided only a right of first refusal conditioned on a decision by the NPS to lease the land.[2] The government argues that NPS has no intention of re-leasing the property, but that under NPS regulations it will authorize the use of the property through right-of-way permits. In the alternative, the government argues that the plaintiff's claim fails because its alleged damages are speculative, remote, and

---

[1] Because the court relies on matters outside of the pleadings, the court treats the government's motion for failure to state a claim under RCFC 12(b)(6) as a motion for summary judgment under RCFC 56. See RCFC 12(b)(6).

[2] The holder of an option to lease property can compel the renewal of a lease by an unwilling landowner, whereas the holder of a right of first refusal only has a right to renew the lease if the landowner decides to lease the land. See Corbin on Contracts § 11.3 (2006).

unforeseeable. For the reasons stated below, the court agrees with the plaintiff that the terms of the leased provided an option, which COBi exercised according to the terms of the lease. Therefore, the court holds that the government, in refusing to renew the lease, breached the lease with COBi. In addition, the court holds that the damages alleged by COBi are sufficiently foreseeable and directly resulting from the breach of the lease to maintain this action.

## BACKGROUND

The lease in dispute was entered into by private parties. On October 23, 1970, Sacramento Valley Television Inc. ("SVTI") entered into a lease with several individuals under which SVTI leased certain land from Lois Tracy. On December 22, 1970, the NPS purchased the land subject to the lease. COBi, which was the parent company of SVTI, succeeded SVTI's interest in the leasehold and the lease in 1986. The lease, which expired on July 31, 2006, provided for an annual rent of $2,500. As the lessee, COBi has managed the site, used part of the property for its own communications-related functions, and rented the property to various radio and television stations, cellular companies, and other communications-related entities. COBi receives approximately $140,000 in annual rents.

The lease provided as follows:

> 3. USE OF PREMISES. It is specifically agreed between the parties hereto that Lessee shall have the right on the herein demised premises, to construct, maintain and operate its television transmitting facilities, radio communications, microwave location, and any other electronic communication

facilities now in existence or that may hereafter be developed as a result of the growth or improvements of the electronic arts and in addition, subject to the conditions herein set forth, Lessee shall have the right to maintain any buildings or structures necessary to house its employees and electronic facilities on the herein demised premises.

Lessee shall have the right, without limitation, to assign, sublet, or underlet any part of said demised premises for any purposes granted hereunder.

***

5. ADDITIONAL RIGHTS AND USES. . . . It is further understood and agreed between the parties hereto that the use of the 5-acre demised premises for television, radio, microwave and other communication purposes shall be exclusive to Lessee. The Lessor and Crawford Distributees, their successors and assigns, shall not during the term hereof hereafter grant a right to directly or indirectly permit the use of any land described as Parcels 1 & 2 in Exhibit "B" hereto, for television, radio, microwave or other electronic communication purposes without the express written consent of Lessee first had and obtained.

***

7. TITLE TO IMPROVEMENTS. It is specifically understood and agreed that all electronic equipment, buildings, and other structures in place or that may hereafter be installed by Lessee shall at all times remain its property, and at the end of said Lease, or sooner termination thereof, Lessee shall have the right and obligation to remove same.

***

10. OPTION. At the expiration of the term hereof, Lessee shall have the first right, privilege and option to renew this Lease for a period of fifty (50) years at a rental to be fixed by agreement between said parties and/or their successors in interest. Within ninety (90) days prior to the expiration of said Lease, Lessee shall notify Lessor, in writing, of its election to exercise its option to extend said Lease for the additional term, and shall notify Lessor of the rental which it is willing to pay for said extended term. If said rental is not acceptable to Lessor or her successors or assigns, then within thirty-five (35) days after the receipt of such written notice, the amount of rental shall be submitted to arbitration. Lessor shall appoint one arbitrator and Lessee shall appoint one arbitrator, and if said arbitrators can not agree, then they shall jointly appoint a third arbitrator, in which event the decision of a majority of the arbitrators shall be conclusive upon Lessor and Lessee and shall be rendered and determined prior to [expiration of the lease on July 31, 2006] August 1, 2006. The cost of such arbitration shall be borne equally by Lessor and Lessee.

Pl.'s Ex. 2 (emphasis added).

On October 10, 2005, COBi notified the NPS in writing that it "intends to exercise its option to renew its mountaintop lease of Shasta Bally for an additional 50-year term." Pl.'s Ex. 4. In the letter, COBi proposed, in accordance with the provision for renewing the lease, that the annual rent for the property be $12,538.66 for the first year of the option term, subject to annual adjustments with reference to the Consumer Price Index. Pl.'s Ex. 4.

In response, on November 1, 2005, the NPS stated that, under California law, the lease provision – "first right, privilege, and option to renew" – gives COBi only "a conditional right of first refusal . . . if the NPS determines that it is willing and able to lease the premises again." Pl.'s Ex. 5 (emphasis added in NPS letter). The letter further stated that NPS had no intention of re-leasing the property:

> Under applicable law and policy, the NPS cannot offer any party, including COBi, the opportunity to lease the area on Shasta Bally. . . . [A]ll types of authorizations previously issued for communications facilities will be converted to NPS right-of-way permits as those authorizations expire. Unlike leases, NPS right-of-way permits are discretionary and revocable documents issued for ten-year periods, and they do not convey or imply any interest in the land. The compensation terms in NPS right-of-way permits require the payment of fair market value for the use and occupancy of the lands. Permittees are also required to reimburse the NPS for administrative and other costs incurred by the NPS in processing the permit application . . . . Compliance under the National Policy Act is required for the issuance of an NPS right-of-way permit.

Pl.'s Ex. 5.

On December 2, 2005, the NPS again wrote to COBi, indicating that

representatives of the NPS and COBi had met on November 10, 2005, to discuss the lease. The letter reconfirmed the position of the NPS that the lease did not provide COBi an unconditional right to renew the lease. In addition, the letter stated that COBi and each of its sublessees would need to apply for right-of-way permits if they wanted to remain at the site beyond the expiration of the lease. Pl.'s Ex. 6.[3]

On January 12, 2006, the NPS wrote to COBi in reference to a letter from COBi dated December 14, 2005, in which COBi allegedly had asked for clarification of the right-of-way permitting process. In its letter, the NPS stated that 36 C.F.R. § 14.26 requires the NPS to assess a fair market value charge for the use and occupancy of NPS lands. The letter stated that permit fees for "wireless telecommunication facilities in the Pacific West have ranged from $800 to $2500 per month per tower owner." Def.'s Ex. 1. The letter also stated that applicants for right-of-way permits are required to reimburse the United States for the cost of environmental compliance under the National Environmental Policy Act ("NEPA"). Def.'s Ex. 1.

On February 17, 2006, COBi filed suit in this court seeking damages in excess of $1,000,000 for breach of contract and seeking a declaration that COBi has an option to renew its lease for fifty years at a rental to be fixed pursuant to the procedures provided for in the lease.

---

[3] It is not disputed that, if the lease provided COBi with an unconditional option, a permit would not be required under NPS guidelines. In particular, the NPS Reference Manual provides that a permit is not "required when the special use is authorized by a property right, such as a deeded easement." RM-53 Special Park Uses Permitting Instruments, Chapter 7, page C7-1.

The court held oral argument on October 26, 2006. For the reasons stated below, the court **GRANTS** COBi's motion for partial summary judgment and **DENIES** the government's cross-motion for summary judgment.

## DISCUSSION

### I. Standard of Review

The parties have filed cross-motions for summary judgment on the complaint under RCFC 56. Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." RCFC 56(c); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986). A fact is material if it would affect the outcome of the suit. Id. at 248. Doubts as to factual issues must be resolved in favor of the non-moving party. Mingus Constructors, Inc. v. United States, 812 F.2d 1387, 1390 (Fed. Cir. 1987). The moving party bears the initial burden of demonstrating an absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Liberty Lobby, 477 U.S. at 248. In order to defeat summary judgment, the nonmoving party must go beyond the pleadings and "set forth specific facts showing that there is a genuine issue for trial." RCFC 56(e); Celotex, 477 U.S. at 324.

Cross-motions for summary judgment are not an admission that no material facts

remain at issue. See Massey v. Del Labs., Inc., 118 F.3d 1568, 1573 (Fed. Cir. 1997) (citations omitted). "Each party carries the burden on its own motion to show entitlement to judgment as a matter of law after demonstrating the absence of any genuine disputes over material facts." Id.

At issue in this case is the interpretation of a lease. "Contract interpretation is a matter of law. . . ." Neal & Co. v. United States, 945 F.2d 385, 390 (Fed. Cir. 1991) (citations omitted). Thus, contract interpretation is suited to resolution by summary judgment. P.R. Burke Corp. v. United States, 58 Fed. Cl. 549, 554 (2003) (citations omitted). Here, if the material facts are undisputed, the court may interpret the lease and award summary judgment according to applicable law. See Prudential Ins. Co. of Am. v. United States, 801 F.2d 1295, 1300 n. 11 (Fed. Cir. 1986), cert. denied, 479 U.S. 1086 (1987), ("The determination [of the duties] which may be implied in a lease agreement is a question of law, and is reviewed as such.").

## II. Choice of Law

### A. Interpretation of the Lease Provisions

COBi argues that the court should apply California law in interpreting the lease because the lease agreement involves real property located in California. The government does not disagree that California law applies in interpreting the lease, but contends that the result is the same under either federal law or California law.

The Court of Appeals for the Federal Circuit has held that federal law, rather than

state law, governs the interpretation of leases with the United States government. See Prudential Ins., 801 F.2d at 1298 ("It is well settled that contracts to which the government is a party – and though a lease may concern and convey a property interest it is also very much a contract – are normally governed by federal law, not by the law of the state where they are made or performed."); Forman v. United States, 767 F.2d 875 (Fed. Cir. 1985).

However, the Federal Circuit has also held that where federal law is not dispositive, courts should look to "general property and contract law principles as they are embodied in state law pronouncements." Ginsberg v. Austin, 968 F.2d 1198, 1200 (Fed. Cir. 1992). See also Prudential Ins., 801 F.2d at 1298 (citations omitted) ("To the extent existing federal law is not determinative of the issue and permits an area of choice between the merits of competing principles, the best in modern decision and discussion, including the general principles of contract and landlord-tenant law, should be taken into account.").

Here, the parties do not cite, and the court has not found, any controlling Federal Circuit law or other controlling federal case law on the issue of whether the language contained in the lease provides an option to renew the lease or only a right of first refusal. While the government cites various decisions in which federal courts have interpreted lease provisions, these cases were between private parties and involved the application of state law. As such, there is no controlling federal law on this issue where the United States government is a party.

Since federal law does not answer the issue, the court first looks to the law of the state of California for guidance because this is the state in which the property is located. Examination of the law of the state of California is appropriate because, at the time of the execution of the lease, the United States was not a party to the lease, and thus the parties would have expected that the law of the state in which the land was located would apply. See Restatement (Second), Conflict of Laws, § 189 (1971). This is also consistent with Coconut Grove Entertainment, Inc. v. United States, 46 Fed. Cl. 249, 251 (2000), which concluded that a lease that was acquired by the government incident to its purchase of the underlying fee interest was a "lease between private parties." In reaching its conclusion that the lease was not a contract within the purview of the Contract Disputes Act, 41 U.S.C. §§ 601-613 (2000),[4] the court noted "the lease was an existing agreement between private parties at the time the [government] succeeded to the landlord's interest." Id. Similarly, here, the NPS purchased the property subject to a lease which had been entered into by private parties, and the parties would have expected the law of the state of California to apply.

In addition, because the court is not bound by California law, it will also look to the law of other states that have had an opportunity to rule on similar lease provisions. Indeed, an examination of the California cases indicates that California courts have also looked to the law of other jurisdictions in analyzing similar lease provisions. See, e.g.,

[4] Neither party contends in this case that the lease is a contract within the purview of the Contract Disputes Act.

Falkenstein v. Popper, 183 P.2d 707 (Cal. Ct. App. 1947); Glenn v. Bacon, 260 P. 559 (Cal. Ct. App. 1927).

### B. Determination of Whether the Damages are Speculative, Remote, and Unforeseeable.

On the issue of whether the damages sought by COBi are speculative, remote, and unforeseeable, the court applies federal law. Despite the plaintiff's contention that California law applies, federal law is dispositive on this issue, so there is no need to turn to state law. Ginsberg, 968 F.2d at 1200. There are ample decisions by the Federal Circuit as well as the Court of Federal Claims (including one decision cited by the plaintiff) regarding the issue of whether certain damages for breach of contract can be recovered against the federal government. See, e.g., San Carlos Irr. & Drainage Dist. v. United States, 111 F.3d 1557, 1563 (Fed. Cir. 1997); Assurance Co. v. United States, 813 F.2d 1202 (Fed. Cir. 1987); Mann v. United States, 68 Fed. Cl. 666 (2005). Therefore, the court applies federal law in determining whether the damages sought by COBi are speculative, remote, and unforeseeable.

## III. The Government Has Breached the Lease with the Plaintiff.

### A. The Lease Provided the Plaintiff with an Option and Therefore the Government Breached the Lease When it Refused to Renew the Lease.[5]

In interpreting the lease, the court begins with the plain language of the agreement. Gould, Inc. v. United States, 935 F.2d 1271, 1274 (Fed. Cir. 1991). When interpreting

[5] Ordinarily, a lessee is entitled to specific performance in the event that a lessor refuses to honor an option. See Streicher v. Heimburge, 205 Cal. 675, 680 (Cal. 1928); 167 A.L.R. 727. However, because this court does not have jurisdiction to award specific performance, the court may award only monetary damages.

the language of a contract, a court gives reasonable meaning to all parts of the contract and does not render any portion meaningless, or interpret any provision so as to create a conflict with another provision. NVT Techs., Inc. v. United States, 370 F.3d 1153, 1159 (Fed. Cir. 2004). A contract should be viewed in its entirety and given the plain meaning which would be derived by a reasonably intelligent person acquainted with the contemporaneous circumstances. Con't Collection & Disposal, Inc. v. United States, 29 Fed. Cl. 644, 649 (1993). Ultimately, the court's task is to ascertain the intention of the contracting parties. Beta Sys., Inc. v. United States, 838 F.2d 1179, 1185 (Fed. Cir. 1988). The court must give meaning and effect to the intentions of the parties as expressed in the language of the contract. Aleman Food Servs., Inc. v. United States, 994 F.2d 819, 822 (Fed. Cir. 1993).

At issue is the meaning of the following paragraph within the lease:

> 10. OPTION. At the expiration of the term hereof, Lessee shall have the first right, privilege and option to renew this Lease for a period of fifty (50) years at a rental to be fixed by agreement between said parties and/or their successors in interest. Within ninety (90) days prior to the expiration of said Lease, Lessee shall notify Lessor, in writing, of its election to exercise its option to extend said Lease for the additional term, and shall notify Lessor of the rental which it is willing to pay for said extended term. If said rental is not acceptable to Lessor or her successors or assigns, then within thirty-five (35) days after the receipt of such written notice, the amount of rental shall be submitted to arbitration. Lessor shall appoint one arbitrator and Lessee shall appoint one arbitrator, and if said arbitrators can not agree, then they shall jointly appoint a third arbitrator, in which event the decision of a majority of the arbitrators shall be conclusive upon Lessor and Lessee and shall be rendered and determined prior to August 1, 2006. The cost of such arbitration shall be borne equally by Lessor and Lessee.

Lease ¶ 10 (emphasis added).

The government argues that, because the word "first" is used in the first sentence – ". . . Lessee shall have the first right, privilege and option to renew this Lease for a period of fifty (50) years . . . " – the lease provided COBi with a right of first refusal, and thus the lessor retained the decision to offer or not offer the property for lease. In response, COBi contends that other language in this paragraph – specifically the title of "OPTION" and the language specifying the procedures for renewing the lease – make it clear that COBi was given an option, which guaranteed its right to renew the lease for another term of fifty years.

### 1. Whether the Use of the Word "First" Provides a Lessee with a Conditional Right of First Refusal Depends on the Language of the Entire Lease.

The government argues that under California law the word "first" preceding the words "right, privilege and option" indicates that COBi has a right of first refusal. For this proposition, the government relies on Ablett v. Clauson, 272 P.2d 753, 755 (Cal. 1954) (en banc). In Ablet, the Supreme Court of California interpreted a clause that gave the lessees "the first right and a prior option to secure a lease upon said premises before the same are offered to any other person, firm or corporation for lease or rental . . . ." Id. at 754. The Ablet court held that the provision provided the lessee a right of first refusal, conditioned upon the lessor's leasing of the property again. Id. at 755. The Ablet court stated that its holding was consistent with Falkenstein v. Popper, 183 P.2d 707 (Cal. Ct.

App. 1947),[6] and with the "clear weight of authority" (citing 6 A.L.R.2d 820). Id. The government also relies on a later case, Nelson v. Reisner, 331 P.2d 17, 20 (Cal. 1958) (en banc), in which the Supreme Court of California cited Ablet with approval.

COBi acknowledges that under California law the word "first" may sometimes indicate that a lessee has a right of first refusal, rather than an option; however, it contends that, where other language is present in the lease that indicates that the lessee is given an option, the use of the word "first" is not controlling. COBi relies on Butt v. Maier & Zobelein Brewery, 6 Cal. App. 581, 585 (1907), in which the court held, based on the other language contained in the lease, that the word "prior" in the phrase "prior right to lease" did not qualify the lessee's right to renew the lease.[7] In addition, COBi

---

[6] In Falkenstein,183 P.2d at 707-708, the lease contained the following language:

> (a) For the period of two (2) years, Lessee shall have the exclusive option to purchase said property for said price; said option shall expire May 1, 1944.
> (b) For the remaining period of said term, to-wit, three (3) years, Lessee shall be given the first opportunity to purchase said property for said price, and in the event that Lessee shall not avail himself of said opportunity and shall not desire to purchase said property, Lessor shall then be free to sell said property to any other person for any price agreeable to her.

In interpreting subdivision (b), the Falkenstein court stated: "In construing the agreement here, the court must give some meaning to subdivision (a) in its relation to subdivision (b), for if the parties intended that the plaintiffs were to have an exclusive option to purchase the entire five year term of the lease, there would have been no reason for subdivision (a) . . ." Id. at 708. The court added, "[T]he weight of authority holds that the use of such words as 'first privilege,' 'first right,' etc., do not give the lessee an absolute right to purchase or renew a lease." Id. at 709.

[7] In Butt, 6 Cal. App. at 583, the lease contained the following provision:

> At the expiration of this lease the said second party shall have the prior right to lease the same, said premises, for a further term of five years, for the rental sum of $3,000 for the full term, payable at the rate of $50 per month on the first of each and every month of said term. Provided, however, that if the said second party shall avail itself of that privilege, that then and in that event, the said first party shall not be required to pay for any improvements at the end of said term of five years, but that then, at the option of said first party, the said premises shall be surrendered to her with all

contends that neither Nelson or Ablet is relevant to the agreement at issue here. COBi argues that the lease at issue in Ablet contained conditional language, "before the same are offered to any other person, firm or corporation for lease or rental," 272 P.2d at 754, that is not present here, and that in Nelson there was no dispute that the lease provided a right of first refusal.[8]

The court agrees with COBi that the use of the word "first" is not determinative and that the court must look to the entire "option" provision to determine the intent of the parties.

**2. The Subject Lease Provided the Lessee With an Option.**

COBi argues that it has an option based on the following provisions of the lease – specifically, the paragraph's title of "OPTION" and the use of the word "its" in the paragraph explaining the procedures for renewing the lease ("Within ninety (90) days prior to the expiration of said Lease, Lessee shall notify Lessor, in writing, of its election

---

improvements thereon.

In interpreting this clause, the court stated: "There is no ambiguity or uncertainty as to the provisions of said clause 2. It clearly, and without qualification or reservation, gives the lessee the right to renew the lease for a further term of five years, for the term rent of $3,000, payable in equal monthly installments . . ." Id. at 584-585. The court further stated, "The word 'prior' as used in clause 2, does not qualify the right of renewal. The right given the lessee to lease for a further term of five years must necessarily be prior to the right of other parties to lease the property." Id. at 585 (emphasis in the original).

[8]Alternatively, COBi contends that the word "first" modifies only the word "right" in the phrase "first right, privilege and option." Thus, COBi contends that the lease gives it three distinct powers: (1) the "first right" to renew the lease, (2) the "privilege" to renew the lease, and (3) the "option" to renew the lease. COBi contends that it is the third power – the option power – that COBi has invoked to renew the lease. Because the court concludes that COBi was given an option, the court does not reach this alternative argument.

to exercise its option to extend said Lease for the additional term . . ." (emphasis added) ("renewal provision").[9] COBi further argues that the 90-day notice requirement in the renewal provision demonstrates that the lease provides the lessee an option because if the lease provided only a right of first refusal, the government could extinguish the lessee's right of first refusal by simply waiting until after the 90-day deadline had passed before indicating that it was willing to lease the premises. Finally, COBi contends that the fact that the lease provides that the rent was to be set by binding arbitration further demonstrates that COBi was given an option and not simply a right of first refusal.

The government challenges COBi's interpretation. The government argues that the use of the word "option" in the title and in the renewal provision is not determinative. The government argues that there are many varied terms used to denote a right of first refusal and that many of these first refusal provisions include the word option.[10] Thus, the government argues, the critical term to consider is the word "first" rather than "option." The government argues that the detailed renewal process, including the arbitration process for setting rent, does not conflict with the lessor's right to rent or not

---

[9] COBi also argues that the fact that the parties added the title "OPTION" and the provision quoted above to the lease when it was renewed in 1970 is further evidence that the parties intended to provide the lessee with the power to decide whether to extend the lease unilaterally.

[10] The government cites a treatise, which notes that there is some confusion between a right of first refusal and an option, in part because a right of first refusal has been described in many different ways. Corbin on Contracts § 11.3 n.1 (internal citations omitted) ("This contract right of first refusal has been called a 'first option to buy' and 'first privilege of buying' 'preemptive option'; 'preemptive right'; 'preemptive right to purchase,' 'right of preemption' and 'first right of purchase'; 'first-refusal-to-purchase'; 'preference as a purchaser'; 'independent privilege'; and erroneously 'option.'").

rent the property. According to the government, even after the arbitration process is followed, the government retains the right to not lease the premises.

In deciding this matter, this court is guided by the fundamental principle that a court must endeavor to discern the true intention of the contracting parties. Beta Sys., Inc., 838 F.2d at 1185; Aleman Food Servs, Inc., 994 F.2d at 822.[11] Applying that principle to this case, the court agrees with COBi that the language of the lease demonstrates that COBi was given an option. In particular, the court finds that COBi was given an option rather than a right of first refusal based on the following lease provisions: (1) the specific time frame in which the lessee was to exercise "its option" ("ninety (90) days prior to the expiration"), (2) the definite period of time for the further term of the lease ("fifty (50) years"), and (3) the binding process through which the rent was to be

[11] COBi argues that, if there is any uncertainty as to the meaning of the lease, the court should construe the lease in favor of the tenant. Streicher, 205 Cal. at 283 (quoting Kaufmann v. Liggett, 209 Pa. 87 (1904)). COBi argues that this principle applies to the government the same as it would have applied to its predecessor in interest.

The government argues that the rule cited by COBi is premised on the idea that the lessee is not involved in the negotiation of the terms of the lease, whereas here there is no evidence that the lessee had no involvement in drafting the lease. The government argues that, in similar situations where there is no evidence to show that the landlord was not the sole drafter of the lease, California courts have refused to interpret uncertainties in a lease in favor of the tenant. See Mitchell v. Exhibition Foods, Inc., 184 Cal. App. 3d 1033, 1042 (1986); Baird v. Lindblad, 75 Cal. App. 2d 202, 205 (1946). See also San Joaquin v. Work. Comp. App. Bd., 117 Cal. App. 4th 1180, 1186 (2004) (refusing to construe a settlement agreement in a workers' compensation case against the drafter where the agreement was the result of negotiations).

Because the identity of the drafter of the lease is not known, the court declines to interpret these provisions in favor of the lessee because there is no evidence in the record that the government's predecessor in interest was the sole drafter of the lease. See Mitchell, 184 Cal. App. 3d at 1042; Bates v. Ind. Property Holding Co., 318 P.2d 741, 745-746 (Cal. Ct. App. 1957). Moreover, there is no reason to resort to this rule of construction because, as discussed above, the court finds that, when read as a whole, the lease unambiguously provided COBi with an unconditional option.

established (the "decision of a majority of the arbitrators shall be conclusive" in setting the rent by August 1, 2006, [one day after the first lease expired] if the lessee and lessor cannot agree on the amount of rent themselves). These specific provisions demonstrate that an option was granted because these provisions leave no discretion for the lessor. In addition, the court finds that the use of the phrase, "the lessee at its option" (emphasis added), eliminates any ambiguity as to the parties' intention here to provide the lessee with an option.

The court finds that the renewal provision here is therefore similar to the provision at issue in Butt, 6 Cal. App. at 584-585, which stated that the lessee had a "prior right to lease" the premises for a further term of five years for a rental sum of $3,000. The court in Butt held that there was "no ambiguity or uncertainty" that the lessee was given a right to renew the lease and that the use of the word "prior" did not qualify that right. Id.[12]

---

[12] The application of the court's reasoning in Butt to the lease provision here is also consistent with Glenn v. Bacon, 260 P. 559 (Cal. Ct. App. 1927). In Glenn, the lease contained the following clause: "It is expressly agreed and understood that said lease shall run at the option of the parties hereto for five years from date hereof." Id. at 560 (emphasis added by Glenn court). The court noted that the use of the words "at the option of the parties" created uncertainty, because the language could be read to mean that the additional term should only become effective upon the joint agreement by the lessor and lessee. Id. In reaching its conclusion that the lease provided solely the lessee with an option, the court reviewed a number of other cases in which courts had construed clauses involving options. While the Glenn court relied in part on the fact that other courts had construed the terms of the lease most favorably to the lessee (which as discussed in footnote 11 the court does not do here), it also relied on the other courts' interpretations of provisions similar to the ones at issue here as providing the lessee with an option. For example, the Glenn court relied on Stetler v. North Branch Transit Co., 101 A. 980 (Pa. 1917), in which the court held that the word "first" in the phrase "first privilege" should not "be so construed as to nullify a valuable right in the hands of the lessee, which, under the paragraph as a whole, was evidently intended to be created." Glenn, 260 P. at 562 (citing Stetler, 101 A. at 301). The Glenn court also relied on Burgener v. O'Halloran, 181 N.Y.S. 235 (N.Y. App. Div. 1920), which construed the following clause in a lease: "That the said tenant shall notify the said landlord one month before the expiration of the term, if he desires to renew

Here, as well, there is no doubt that, for the period of the 90 days prior to expiration of the initial lease, COBi had the "option" at "its" discretion to renew the lease. To hold otherwise would render the detailed language of the renewal provision meaningless.

Indeed, it is the language of the renewal provision that demonstrates why the subject lease is markedly different from the lease provision in the cases on which the government relies: Ablet and Falkenstein.[13] In Ablet, the lease stated that the lessees "shall have the first right and a prior option to secure a lease upon said premises before the same are offered to any person, firm or corporation for lease or rental and that said option shall contemplate a lease for a period of five (5) years upon terms then agreed upon." 43 Cal.2d at 281 (emphasis added). The additional language following the phrase "first right and a prior option" – referencing priority over an offer by a third party and leaving the terms open – made it clear that the lease provided a right of first refusal instead of an option. In Falkenstein, the lease contained two clauses: the first provided

---

the lease." Glenn, 260 P. at 562 (citing Burgener, 181 N.Y.S. at 236). In holding that the lessee's had an unconditional right to renew the lease, the Burgener court stated, "As I look upon this proposition, the pertinent and cardinal questions to be asked here are: What is the meaning of the clause in question? [A]nd why was it thus put in the agreement under consideration? If it does not mean that this tenant was to have the option of the renewal of the lease for one year, upon his giving one month's notice, what does it mean, and why was such a clause put into the lease at all?" Id. at 563 (citing Burgener, 181 N.Y.S. at 238). Thus, the decision of the Glenn court and the cases it relies on, support the conclusion here that the lease provided the lessee with an option.

[13] While the government correctly points out that the Ablet decision is more recent, Butt has not been overturned, but instead has been distinguished on its facts. See Ablet, 43 Cal.2d at 284 (citing Falkenstein, 183 P.2d at 709). Also without merit is the government's argument that Butt is not relevant here because it dealt with a lease provision that contained the word "prior" rather than the word "first." The lease provision at issue in Ablet likewise used the word "prior" as a modifier to "option" in the phrase "first right and prior option," but the government nonetheless argues that Ablet is relevant here.

an "exclusive option" for the first two years, and the second provided "the first opportunity" for the next three years. 183 P.2d at 707-708. In interpreting the second clause, the court reasoned that "there would have been no reason" to separate out the first clause (which provided for an exclusive option for two years) if the second clause had also provided an option for the remaining three years. Id. at 708.

Finally, the court is persuaded by the reasoning of other courts that have interpreted very similar language to the subject lease and which concluded that the lease provided an option. See Pruner v. Brown, 216 Va. 885 (Va. 1976); Steen v. Rustad, 313 P.2d 1014 (Mont. 1957); Associated Truck Lines, Inc. v. Baer, 77 N.W.2d 384 (Mich. 1956).[14]

First, the Supreme Court of Virginia in Pruner interpreted similar language to that at issue here as providing an option. At issue was the following language:

> THE LESSEES shall have the first right to purchase the leasehold property at the end of the fourth year of the lease at the price of Sixty Five Thousand Dollars ($65,000.00) payable at the rate of Ten Thousand Dollars ($10,000.00) down, the assumption of any first trust remaining thereon at the time of the exercise of the option, and the balance secured by deed of trust payable at the rate of Three Hundred Dollars ($300.00) per month, with interest thereon on the unpaid balance at the rate of seven per centum (7%) per annum for a period of ten (10) years, and the entire amount, principal and interest to be paid on or before the expiration of ten (10) years from the date of the said deed of trust.

Id. at 886 (emphasis added). The assignee of the lessor argued that the word "first" meant

---

[14] The government relies on London v. Joslovitz, 110 N.Y.S.2d 56 (N.Y. App. Div. 1952), the only case to include language similar to the lease language at issue here to support its interpretation of the lease. While the London court held that the word "first" was dispositive despite other provisions in the lease, the case contains no reasoning. The holding of the London court is also inconsistent with Pruner, Steen, and Associated Truck Lines, which have examined similar language in greater detail.

that the lessee had only a right of first refusal to purchase the property and that the lessor therefore was not required to sell the property. In holding that the lease provided the lessees with an option, the Pruner court reasoned, "Here, the lease specified the purchase price, terms and manner of financing and time when the right could be exercised. These terms are far more compatible with an absolute option than they would be with a right of first refusal. Even the parties . . . refer to the right as an option." Id. at 887. The court continued, "We are not dealing here with a bare 'right of refusal' but with an instrument which, by its specificity, would unquestionably have created an absolute option except for the word 'first' in the first line of paragraph 7. Reading and construing the agreement as a whole, we hold that the right which it created was an option . . . ." Id.

Second, the Supreme Court of Montana reached a similar conclusion in Steen that the phrase "first option to buy" in a contract was not controlling where other language in the contract indicated that the lessee was given an exclusive option to buy the property. 313 P.2d at 1018. The court determined that the phrase, "Landlord hereby agrees to let and lease unto the tenant, and give the tenant a first option to buy" (emphasis supplied by Steen court), was not conclusive where the following language was also found in the contract:

> In the event "Plan No. 2" is chosen by tenant, tenant shall notify landlord prior to said date of this choice, and such payment shall then constitute rental of the land for year 1951, and further, shall constitute a down payment upon a contract for sale of said land. . . . Landlord agrees to sell and tenant agrees to buy the land hereinbefore described for the sum of $8,500.00 . . . . The foregoing paragraph shall constitute the minimum provisions under which tenant may exercise his option to buy . . . . It is Further Understood and Agreed, that in the event that the tenant is called into the military services [by]

> the United States before he exercises his option to buy, then the tenant cannot exercise said option and the landlord shall not be bound by tenant's option to buy.

Id. (emphasis added by Steen court). Based on this language, the Steen court concluded, "the entire language of the agreement tends toward only one interpretation; that the plaintiff was given an exclusive option to buy the property described under the lease; that his method of exercising his options as by tendering $1,500 to the defendant, as called for by 'Plan No. 2.'" Id.

Finally, the Supreme Court of Michigan held in Associated Truck Lines that the word "first" was not controlling in determining whether the tenants were granted an option in a lease. 246 N.W.2d at 387. The lease granted the lessee the "first right and option to purchase from the undersigned the premises" for $65,000 at any time during the term of the 15-year lease, but not until after January 1, 1944 [two years after the commencement of the lease]. Id. at 385. The lessors contended that the word "first" was conclusive in determining that the option was conditional. Id. at 386. However, the Associated Truck Lines court held that the lessee had an unconditional option, reasoning that giving "the effect to the word 'first' contended for by [the lessors] would be to fly in the face of the provision in the option that [the lessee] was not permitted to exercise it during the first two years of the term of the lease." Id. The court stated, "The two-year restriction on [the lessee's] right is eloquent of the parties' intent that the option was, thereafter, to be absolute and not conditioned on optionor's willingness to sell. . . . In the instant case, regard for the mentioned two-year clause makes it impossible to give the

word 'first' the effect contended for by [the lessors]. Id. at 387.

Applying the reasoning of those courts to this case, there is no question that COBi was given an option in the subject lease and not simply a right of first refusal. Like the leases at issue in Pruner, Associated Truck Lines, and Steen, which specified the time and manner in which the right could be exercised as well as the rent or purchase price, here the lease specified the time and manner in which the right could be exercised and the procedures through which the rent was to be determined. In addition, like the leases at issue in Pruner and Steen, the parties to the lease here also referred to the right as an "option" and left no discretion regarding its exercise with the lessor. Therefore, like the Pruner, Associated Truck Lines, and Steen courts, this court holds that the right created by the lease here was an option to renew the lease for fifty additional years.

**B. COBi Alleges Sufficient Damages to Defeat the Government's Motion.**

Having concluded that COBi had an option to renew the lease of the property for another fifty years, the court turns to the government's alternative argument that the plaintiff has failed to allege a sufficient claim for damages to maintain this action. The government argues that COBi's alleged damages are too speculative, remote, and unforeseeable. The general rule in common law breach of contract cases is to award damages "sufficient to place the injured party in as good a position as he or she would have been had the breaching party fully performed." San Carlos Irr. & Drainage Dist. v. United States, 111 F.3d 1557, 1563 (Fed. Cir. 1997). "Remote and consequential damages are not recoverable in a common-law suit for breach of contract . . . especially . .

. in suits against the United States for the recovery of common law damages." Id. "Damages resulting from a contract breach must be reasonably foreseeable and contemplated by the parties when entering into the contract." CCM Corp. v. United States, 15 Ct. Cl. 670 (1988). For lost profits to be recoverable, they must "flow from the contract that is the subject of the lawsuit and not from 'independent and collateral undertakings.'" Precision Pine & Timber, Inc. v. United States, 72 Fed. Cl. 460, 471 (2006) (quoting Energy Capital Corp. v. United States, 302 F.3d 1314, 1328 (Fed. Cir. 2002)).

The government argues that the damages COBi seeks are too speculative and remote. In addition, the government argues that the alleged damages were unforeseeable at the time the lease was entered into or that they were not a direct result of the breach. In support of its motion, the government relies on Essen Mall Properties v. United States, 21 Cl. Ct. 430, 447 (1990) ("[D]amages claims for loss of anticipated profits are generally 'too remote, consequential and speculative' from any breach that may have occurred to be recoverable as a matter of law."), for the proposition that damages that COBi claims for anticipated lost profits are too speculative to be recoverable. The government argues that the reasoning of Essen is especially appropriate here because the lease term at issue is for a period of fifty years. The government further argues that COBi has not identified any provision in the lease that obligates the lessor to pay anticipated lost profits in the event of the lessor's breach.

In response, COBi argues that it has alleged and will be able to establish at trial

two kinds of damages: (1) expenses that it is required to pay under the NPS' permitting process and (2) lost profits based on the loss of its subcontracts.[15] COBi contends that it has been required to pay $16,500 to the NPS as its share of the cost of a NEPA analysis and of the NPS' administration of the site. COBi contends that it has therefore incurred permitting costs that would not have been required if it had been able to exercise its option. Second, COBi contends that it has lost revenue because it has not been able to sub-lease the property to various communications-related entities. COBi contends that some sub-tenants have already given notice of intent to withdraw their transmitters from the tower.

COBi argues that the reasoning of the court in Mann v. United States, 68 Fed. Cl. 666, 670 (2005), should be applied here to COBi's lost profits claims. In Mann, the court held that an assignee of a geothermal lease with the Bureau of Land Management was not precluded from recovering lost profits because lost profits from the sale of geothermal energy directly related to the subject of the contract. Id. The Mann court reasoned that the sale of the geothermal energy was actually contemplated by the parties to the lease because the lease provided that the lessee had the right to sell geothermal steam and because the lease reserved a royalty interest of ten percent of all sales of heat generated under the lease. Id. COBi contends that the lease here provided that the lessee would use the land for "television, radio, microwave and other communication purposes," Lease ¶

[15] In its updated summary of damages, filed on October 20, 2006, the plaintiff also contends that it will seek to recover attorney's fees pursuant to the terms of the lease, which, according to the plaintiff, totaled $82,136.99 as of September 30, 2006.

5, and that the lessee would have the right to sublet the premises, Lease ¶ 3. Therefore, COBi contends, like the lessee in Mann, its lost profits from subletting the property were foreseeable and directly related to the lease.

The court agrees with COBi that it has alleged sufficient damages related to the government's breach of the lease to maintain this action. While the government disputes whether the lost profits from COBi's subcontracts would have been contemplated at the time the lease was signed, it does not dispute that COBi had subcontracts at the time the government acquired the land subject to the lease and therefore the government could have anticipated that COBi would continue to sublet after the lease was renewed. In addition, the government does not dispute that, if COBi holds an option to renew the lease, COBi does not need a permit and therefore should not have to pay for certain permitting costs, which COBi argues it has now incurred.[16]

Given COBi's history of subleasing tower space on the property, the court finds that COBi's claim for lost profits was not unforeseeable and was not too remote or speculative. In addition, because, as a holder of an option, COBi should not be required to obtain a permit, any costs associated with that permitting process, that are not otherwise required, constitute actual damages that are recoverable in this case. Accordingly, COBi has alleged damages that are not speculative and are sufficiently foreseeable and directly resulting from the breach of the lease to maintain this action.

---

[16] The government contends that COBi would be liable for NEPA compliance costs even if it were determined that it does not need a permit. Whether or not this is true, COBi argues that it has or will incur additional permitting costs.

## CONCLUSION

For the reasons stated above, the court holds that COBi has an option to renew the lease, and that the government has breached the lease agreement. As such, the court **GRANTS** COBi's motion for partial summary judgment on the issue of the government's liability for breach of contract, and **DENIES** the government's cross-motion for summary judgment. The court will contact the parties within twenty days to set a schedule for resolving this litigation.

**IT IS SO ORDERED.**

s/Nancy B. Firestone
NANCY B. FIRESTONE
Judge